DAVIDSON *v.* STATE.

Opinion delivered December 22, 1917.

1. LARCENY—CATTLE—UNEXPLAINED POSSESSION.—Under the testimony, *held,* the unexplained possession of certain cattle by the defendant, the cattle having been stolen the day before, would warrant a conviction for the larceny of the same.

2. LARCENY—DRIVING AWAY CATTLE.—Defendant may be convicted of larceny of certain cattle, as a principal, where the proof showed that he assisted his brothers, who actually took possession of the cattle, in driving the cattle out of the country; and the original asportation being still in progress, when defendant was arrested, the larceny will be regarded as still in progress.

3. LARCENY—CATTLE.—Defendant may be convicted of larceny of cattle, where, with a felonious intent, he assisted in driving the cattle into a corral, after his companions had actually stolen them.

Appeal from Garland Circuit Court; *Scott Wood,* Judge; affirmed.

*A. Curl,* for appellant.

1. Defendant was charged as a principal in larceny. Kirby's Digest, § 1821; 37 Ark. 274; 41 *Id.* 173. It is only persons who are present aiding and abetting or consenting to aid and abet who can be indicted as principals. 55 Ark. 593. Hence it was error to refuse instructions 1 and 2, asked by defendant.

2. Nos. 5 and 6, given on the court's own motion, were erroneous. There must be a felonious taking from the owner and asportation. 79 Ark. 333; 110 *Id.* 606.

3. Mere possession of stolen property is not sufficient to convict. 34 Ark. 443; 1 Wharton, Cr. Law, § 729. There is no evidence connecting defendant with the crime. The court erred in failing to properly define larceny and what acts were necessary to constitute the offense.

*John D. Arbuckle,* Attorney General, and *T. W. Campbell,* Assistant, for appellee.

1.   There was no error in refusing instructions 1 and 2, asked by defendant.   The presence of defendant when the cattle were stolen was not essential, if he was present and participated in the asportation.   130 Ark. 358.   The record here does not contain all the instructions given. 121 Ark. 269; 125 *Id.* 393; 104 *Id.* 375, and many others.

2.   The testimony of appellant affords ample ground on which to base No. 5, given.

3.   No. 6 clearly states the law.   130 Ark. 358.

3.   The court properly defined larceny, but no request was made by defendant for such an instruction.   71 Ark. 475; 86 *Id.* 360, 456; 102 *Id.* 588; 77 *Id.* 455, etc.

4.   The evidence is sufficient.   Possession of stolen property, unexplained, is a circumstance of guilt.   91 Ark. 492; 92 *Id.* 586; 55 *Id.* 244; 44 *Id.* 39; *Spivey* v. *State,* 133 Ark. 314.

HART, J.   Isaac P. Davidson was indicted by the grand jury of Garland County for the crime of stealing two cows and two yearlings belonging to Elihu Robbins. He was tried before a jury and convicted, his punishment being fixed at imprisonment in the State penitentiary for the period of one year.

Elihu Robbins testified that at the time the cattle are charged to have been stolen that he lived in Montgomery County, Arkansas; that on the 13th day of December, 1916, he turned two cows and two yearlings out of his pasture; that one of the cows had a bell; that the cattle did not come up that night; that he did not sell or give the cattle to any one; that on the next day he was informed that the cattle were in a barn belonging to William Dozier in Garland County, Arkansas; that Dozier lived about five miles from him and that he went down there and saw the cattle and recognized them to be his own.

William Dozier testified that on the 14th day of December, 1916, while crossing a mountain in company with Ashley Ritter, near his home in Garland County,

Arkansas, he saw three men driving the cattle charged to have been stolen in this suit along a trail; that two of the men were behind the cattle driving them along and that one of them was on the side to keep them from straying from the trail; that he thought the defendant was one of the men driving the cattle; that he recognized the cattle as belonging to Elihu Robbins; that he went to a neighbor's house near by and called Robbins over the telephone and told him about seeing the men driving the cattle along; that Robbins said that he had not disposed of the cattle in any way; that the justice of the peace asked him and one Echols to try to capture the men; that he and Echols halted the men; that the men put spurs to their horses and ran away; that they fired a few shots to halt the men and that one of their horses was wounded; that the cattle came to his house and were put up and Robbins was notified that they were there.

Ashley Ritter testified that he was with Dozier on the 14th day of December, 1916, and saw three men driving some cattle along a trail near Dozier's house; that the defendant was one of the men; that the defendant and another man were behind the cattle driving them and that another man was on the side of the mountain keeping them in the trail; that he did not know the cattle and did not know whose they were.

Other evidence on the part of the State tended to show that it was reported in the neighborhood that the cattle were stolen and that the defendant and the other two men were making an attempt to escape; that people along the road tried to arrest them and shot the two men that were with the defendant; that all three of the men had guns and that the two men with the defendant shot back at the men who were trying to arrest them. The defendant had a pistol on him when arrested but did not try to use it.

One of the witnesses said that he endeavored to hold up the parties, and that all three of them turned their guns on him and kept running; that the oldest one threat-

ened to shoot him if he moved; that the defendant looked
like one of these three men.

According to the testimony of the defendant himself,
he was living with his parents at Fort Lawson, Oklahoma,
and was going to school there. In the latter part of Feb-
ruary, 1916, he left home and went to Texas. He went
to work with a farmer in Texas and stayed with him for
three months. During the latter part of July, he received
a letter from one of his brothers at Hot Springs, Arkan-
sas. In his letter, his brother stated that there was plenty
of work there and that it was a fine place for a young fel-
low to come. His brother had gotten into trouble in Okla-
homa and had changed his name because he thought there
was a warrant out for him. His brother also wrote him
that he had written another brother to come, too. The
defendant went to Hot Springs to meet his brothers about
the 3d of August, 1916. He changed his name so that his
father and mother could not trace him. When he arrived
at Hot Springs he was told by the foreman of a stave
yard that he could secure employment at a place near
there where stave bolts were manufactured. His broth-
ers were not in Hot Springs as they had promised and he
left a card for them, and secured work at the stave mill.
About two weeks after he went to Hot Springs his oldest
brother came to him and told him that he and another
brother were at work at a sawmill not far from there. In
a short time the defendant went up to the sawmill and
joined his brothers. They worked there a while and then
went to a mill in Saline County, Arkansas. The defend-
ant worked at that mill about fifty or sixty days. His
brothers did not work much and spent their time riding
about the country. One time his brothers went off and
were gone about six weeks and brought back horses with
them. The defendant became suspicious and asked them
where they had gotten the horses and they told him that
they had bought them in Kansas. The defendant told his
brothers that their conduct looked suspicious and that he
would leave them if there was anything going on that

was crooked. They told him that it was none of his busi-ness and that he was not liable to get into anything.

In regard to the immediate transaction which resulted in the larceny in question, the defendant testified that one Sunday morning his oldest brother said that he was going out to buy some cattle that day; that he asked him where he would get the money; that his brother pulled a roll of bills out of his pocket and said that he had it; that on Monday morning they started out to buy cattle; that he did not want to go but that his brother insisted, saying that he would need him to drive in the cattle; that it was pretty cool and they put on heavy clothes; that his brother advised him to take a gun along in case of robbers or anything of that kind; that he carried a gun in a scabbard in his hip pocket; that they traveled about twenty-five miles in a westerly direction and camped at night on the side of the road in a house; that the next morning they rode until dinner time and one of the horses became lame; that they left him at the camp with the lame horse and went off to buy cattle; that they rode around that day and night and the next and came back and reported that they could not buy any cattle; that they found a corral and left the defendant there and were gone all night; that the next morning his brothers came in with the four head of cattle and penned them in the corral; that they said that they had bought the cattle; that they again went off and left him there with the cattle and came back again the next morning. They said that they had been unable to buy any more cattle. It began to snow and they said that they would not buy any more until the weather cleared up; that they started to drive the cattle along the trail and that they were attacked by people who tried to arrest them; that they tried to run off; that his brothers were killed in the running fight; that he escaped but was captured the next day.

The defendant's father testified that he was seventeen years old.

(1) The defendant was found in the possession of the stolen cattle. It is true he attempted to explain his

possession but the jury might have found that his explanation was not true and that his possession was inconsistent with his innocence. In short, after recounting the testimony just stated, the unexplained possession by the defendant of the property stolen on the day before, together with the other circumstances detailed in evidence, were sufficient to warrant the jury in returning a verdict of guilty. *Spivey* v. *State,* 198 S. W. (Ark.) 101.

Counsel for the defendant assign as error the action of the court in refusing to give instruction No. 2, asked by him, which is as follows: "The court instructs the jury that if the defendant did not steal the cattle and was not present when the same were stolen (if the cattle were stolen), aiding, advising, abetting, encouraging or assisting such stealing, then the defendant was not guilty and should be acquitted."

In making this contention counsel did not take into consideration the principles of law announced in the case of *Monk* v. *State,* 130 Ark. 358. In that case the court held that under an indictment for larceny as a principal, one who was not present when the hogs were killed and carried away, but who hauled them to market, and knew of the plan to steal them could be convicted as a principal.

(2) Here the facts are even stronger. The defendant was assisting his brothers in driving the cattle out of the country and the larceny may be regarded as still in process of accomplishment, for the original asportation was still in progress.

(3) It was also insisted by counsel for the defendant that the court erred in giving instruction No. 5 at the instance of the State. The instruction is as follows:

"No. 5. If you believe from the evidence in this case, beyond a reasonable doubt, the defendant with felonious intent to steal cattle, accompanied his two brothers to a corral, and that he remained there while his two brothers went after the cattle, or in search of them, and you further believe from the evidence beyond a reasonable doubt that the brothers feloniously took the cattle

mentioned in the indictment to the corral, and the defendant assisted the brothers in driving the cattle away from the corral, with the felonious intent of stealing the same, and that this offense occurred some time during the year of 1916, then you should find the defendant guilty.''

This instruction is in accord with the principles of law laid down in the Monk case.

It is claimed by the defendant, however, that there was no evidence in the record upon which to base the giving of this instruction. We do not agree with counsel for the defendant in this contention. According to the defendant's own testimony he was suspicious of his brothers and thought they were being engaged in crooked work of some kind. When he mentioned this to them they told him that it was none of his business and that he would not get into any trouble. The defendant himself admitted that he stayed at the corral while his brothers were riding about in the night time in the month of December, ostensibly for the purpose of buying cattle. He also admitted that he went along with his brothers for the purpose of helping them to drive the cattle. All three of the brothers were armed with pistols. It had begun to snow when the cattle were brought in. They at once started off with the cattle without trying to buy any more. When halted they endeavored to run away. They had a running fight with the people in the neighborhood and finally abandoned the cattle and tried to get out of the country. When this and the other circumstances detailed in evidence are considered it will be readily seen that there was sufficient evidence upon which to base this instruction.

Other instructions requested by the defendant and still others given by the court at the instance of the State are assigned as error calling for a reversal of the judgment of conviction. These instructions all involve the principles of law which we have just discussed and for that reason we do not deem it necessary to set them out and discuss them separately.

We have carefully examined the record and find no prejudicial errors in it. The judgment will therefore be affirmed.